## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **ACC CONSTRUCTION CO., INC.,** *as assignee of Jerry Herron d/b/a HHH Building Sales,*[1] <br><br>    *Plaintiff,* <br><br> **v.** <br><br> **ROBERTSON-CECO II CORPORATION, d/b/a CECO BUILDING SYSTEMS,** <br><br>    *Defendant.* | **CIVIL ACTION NO.** <br> **5:23-cv-00356-TES** |

## OMNIBUS ORDER

Before the Court are Defendant Robertson-CECO II Corporation's ("CECO")

Motion for Summary Judgment [Doc. 66], Plaintiff ACC Construction Company's

("ACC") Motion for Summary Judgment [Doc. 72], ACC's *Daubert* Motion to Exclude

the Expert Report and Testimony of David E. Rutherford [Doc. 74], and CECO's Motion

to Strike Plaintiff's Untimely-Disclosed Expert Report [Doc. 83].

As explained in further detail below, the Court **DENIES in part** ACC's *Daubert*

---

[1] As a result of an earlier settlement, Jerry Herron d/b/a HHH Building Sales assigned any claim it may have had against Defendant to ACC. Moreover, as detailed in this Order, the Court has resolved any claim against ACC directly. So, that means that the only claim ACC currently has left for trial is solely in its capacity as Herron's assignee. To accurately reflect the true nature of that claim, the Court directs the Clerk to **AMEND** the case caption as above and further directs the parties to only use the updated caption from this point forward. *See* Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest.").

Motion [Doc. 74], **GRANTS** CECO's Motion to Strike [Doc. 83], **GRANTS in part** CECO's Motion for Summary Judgment [Doc. 66], and **GRANTS** ACC's Motion for Summary Judgment [Doc. 72].

## BACKGROUND

1.  ## Factual Background

In its briefs, ACC declares this a simple case. [Doc. 72]; [Doc. 76, p. 1]. ACC's premise rings true—at least, from a broad enough perspective. This is a case about doors.

In 2022, the United States Army Corps of Engineers ("USACE") issued a Request for Proposal ("RFP") for a construction project on Robins Air Force Base in Warner Robins, Georgia (the "Robins Project"). [Doc. 57, ¶ 5]. The bid for this project was a "lowest price, technically acceptable bid." [McKnight Depo., p. 49:16]. To acquire a project from the government under this system, a successful bidder must submit the lowest bid that falls within an acceptable deviation range from the USACE's estimate. [McKnight Depo., pp. 49:16–52:11]. The USACE must also approve the bidder's bond and small business plan. [McKnight Depo., p. 52:12–20]. The Robins Project was also bid-build, meaning the USACE designed it, and all parties involved had to follow the Corps' design. [McKnight Depo., p. 53:7–14]. But, during pre-bidding, contractors could ask the USACE questions about the design. [McKnight Depo., p. 54:1–14].

After the USACE's RFP, ACC called former Defendant Jerry Herron d/b/a HHH

Building Sales ("HHH") about the buildings for the Robins Project. [McKnight Depo., pp. 30:16–24, 33:1]. HHH is an authorized CECO builder, meaning he can order and erect CECO's pre-engineered metal buildings ("PEMBS"). [Herron Depo. I, pp. 14–17];[2] [Doc. 69-1]. Due to his status as a fully-disabled veteran, companies that contract with HHH have access to certain military projects that are set aside for veterans. [Herron Depo. I, pp. 18:17–20:3]. As a result, ACC frequently worked with HHH. [*Id.* at p. 26:7–13]. Due to HHH's relationships with both ACC and CECO, HHH ended up acting as an intermediary on this project. *See* [*id.* at p. 37:14–25]; [McKnight Depo., p. 73:5–13]. At ACC's prompting, HHH submitted a bid on November 16, 2022, to ACC, which was the only bid ACC received for the PEMB portion of the project. [McKnight Depo., pp. 35:20–36:3]; [Doc. 71-2].

To create its November 16, 2022, bid, HHH reached out to CECO for estimates on the PEMB. [Herron Depo. I, pp. 42:20–43:11]. CECO sent HHH its estimates, then HHH created its bid and sent it to ACC. [*Id.* at pp. 53:15–54:7]. Specifically, CECO submitted its PEMB estimate on November 15, 2022 for $3,937,975.50. [Doc. 70-15, p. 2]. HHH then rolled the CECO PEMB estimate into the bid they submitted to ACC which included

---

[2] For purposes of this Order, "Herron Depo. I" refers to the first deposition of Jerry Herron taken January 15, 2025. [Doc. 70]. "Herron Depo. II" refers to the second deposition of Jerry Herron taken September 10, 2025. [Doc. 69].

other materials to erect the PEMB, totaling $4,134,874.28.[3] [Doc. 71-2]. ACC used HHH's bid to help create its bid for the USACE. [Doc. 70-7, p. 1]; [Doc. 70-5, p. 1]. ACC relies on its subcontractors, like HHH, to review and comply with the designs when ACC crafts its own bid. [McKnight Depo., pp. 78:4–80:2].

The USACE subsequently moved the bid date for the project, with the final bid date being December 15, 2022. [Doc. 70-12]. On December 13, 2022, ACC's vice-president Matt McKnight texted HHH asking if "the SSMR [was] covered." [Doc. 70-12]; [Herron Depo. I, p. 58:13–25]. HHH responded, "[i]f you are talking about standing seam metal roof then yes[.]" [*Id.*]. McKnight then told HHH "[y]essir that's it, I figured you had covered[.] New bid date is this Thursday morning if you need to review anything[.]" [*Id.*]. HHH replied saying that he needed to check with CECO to see if the bid was still good. [*Id.*]. A few hours later, HHH texted and said "[m]y number is good[.] I sent you a [sic] email so you would have a record[.]" [*Id.*]. ACC ultimately submitted a bid to the USACE for $98 million. [McKnight Depo., pp. 48:14–16, 49:11–14].

The USACE did not officially award ACC the Robins Project until January 17, 2023, over one month after the bid. [Doc. 71-9]. In the meantime, on January 10, 2023, ACC sent HHH a letter awarding HHH the PEMB portion of the project. [Doc. 71-2].

---

[3] HHH did not just submit a bid for the PEMB materials. As part of its bid, HHH included labor to erect the PEMB, and then material and labor costs for a "[b]id [o]ption" titled "idle bay." [Doc. 71-2]. In total, HHH bid $10,797,324.54. [*Id.*].

That same day, CECO emailed HHH saying that it could "hold the current pricing on this project" if the order was entered by January 19, 2023, and there were no significant changes to the building. [Doc. 71-7, p. 16]. HHH forwarded that email to ACC. [*Id.*]. Seven days later, the USACE sent ACC a letter awarding ACC the Robins Project. [Doc. 71-9].

The issues that led to this lawsuit began sometime between January 25, 2023, and February 3, 2023, when CECO noticed a problem with its bid calculations. [Doc. 70-5, pp. 5–6]. In an email to HHH dated February 3, 2023, CECO stated that its original estimate totaled $90,000 per hangar door. [*Id.* at p. 5]. However, after receiving loads from the hangar door company, CECO ran the calculations again "for worst case scenario." [*Id.*]. Those calculations came out to $650,000—more than six times its estimate—per door. [*Id.*]. In another email to HHH over ten days later, CECO elaborated further on what went wrong. [Doc. 70-8]. CECO stated it provided a design estimate for a building with a standing seam roof, but its design estimate did not include the hangar door system or supports. [*Id.*]. It also did not include the "door wind loading, support materials or design deflection impacts." [*Id.*].

ACC emailed CECO and HHH on February 8, 2023, requesting a conference call to resolve CECO's issues. [Doc. 70-7]. Six days later, ACC sent CECO a letter requesting that CECO honor their bid and again requesting a meeting. [Doc. 70-13, pp. 3–5]; [Doc. 70-5]. After several days of back and forth, CECO emailed ACC a list of questions,

stating that the questions were the best way to "get us back on track . . . ." [Doc. 70-13, p. 1]; [Doc. 70-9, pp. 2–3]. ACC responded on February 24, 2023, and CECO responded to ACC's responses on February 27, 2023, in an email to HHH. [Doc. 70-9, pp. 2–3]. In these emails, ACC and CECO dispute whether the original design specifications contained all the information CECO needed to adequately calculate the hangar doors. [*Id.* at p. 3]. This dispute about the original design specifications will ultimately require a jury to sort out.

In the middle of this back and forth, ACC reached out to L and G Metal Building Consultants LLC ("L and G"). [McKnight Depo., p. 125:3–21]. On March 8, 2023, L and G emailed ACC their own estimates for the PEMBs. [Doc. 71-17, p. 2]. The estimate for all the work—including the optional bay—without the hangar doors was $11,017,676.00—about $1,000,000 more than HHH's original estimate[4] for the same work. *Compare* [*id.*] *with* [Doc. 71-2]. The back and forth ended on March 31, 2023, at 4:14 p.m., when HHH emailed ACC stating that neither HHH nor CECO "will be able to honor the new quote price" past 5:00 p.m. that same day, effectively giving ACC 46 minutes to decide whether it would eat the extra million dollars in costs or not. [Doc. 70-14]. ACC ended up getting the PEMB through Vulcan for $9,691,742.00,[5] and having

---

[4] *See supra*, note 3.

[5] ACC claims Vulcan's proposal is $3,937,232 more than CECO's original proposal. [Doc. 57, ¶ 57]. But the Court notes that Vulcan's proposal is on par with CECO's revised quote. *Compare* [*id.*], *with* [*id.* at ¶ 42].

L and G erect the building. [McKnight Depo., p. 126:4–8]; [Doc. 57, ¶¶ 54–56].

**2.**    **The USACE's Design Documents**

Two of the many design documents for the Robins Project are in the record. They are documents for the "Steel Sliding Hangar Doors," and for "Metal Building Systems." [Doc. 70-16, p. 1]; [Doc. 74-2, p. 1]. Each section begins by listing external publications to which the design documents refer. *See* [Doc. 70-16, ¶ 1.1]; [Doc. 74-2, ¶ 1.1]. The "Metal Building Systems" document lists—by the Court's count—87 external publications. [Doc. 74-2, pp. 1–7]. The "Steel Sliding Hangar Doors" document lists 20 publications. [Doc. 70-16, pp. 1–2].  For example, "AISC 325" is listed as the American Institute of Steel Construction's 2017 Steel Construction Manual. [*Id.*].

The USACE's design specifications are riddled with references to these publications. As another example, under the "Design Requirements" subsection of the "Steel Sliding Hangar Doors" document, the USACE states that the"[d]oor must be of limited combustible construction in accordance with NFPA 220 and NFPA 409." [*Id.* at ¶ 1.4.1]. As a final example: "Design all supporting, steel bracing and framing steel members in accordance with the specified loads and the requirements of AISC 325 and AISC 360." [*Id.* at ¶ 1.4.1.1].

In addition to references to publications (or just hard numbers), there are several subsections of the "Steel Sliding Hangar Doors" document containing collaboration instructions. These include— under "Door Design and Components"—"General

Contractor is required to coordinate structural soffit framing with actual hangar door arrangement to ensure door and soffit dimensions are coordinated." [*Id.* at ¶ 1.4.1]. Part of the "Deflections" subsection states: "Design Doors as a system to withstand the upward and downward deflections of the door header structure. Coordinate with metal building supplier." [*Id.* at ¶ 1.4.3]. These coordination instructions occur elsewhere in the hangar door specifications.[6]

**3.    <u>Procedural History</u>**

ACC initiated this diversity action by filing a Complaint [Doc. 1] on September 18, 2023, asserting claims for breach of contract, promissory estoppel, negligence, declaratory judgment, and attorneys' fees against multiple Defendants—including CECO. On February 11, 2025, on joint motion by the parties, the Court granted a 90-day stay to allow mediation. [Doc. 35]. The parties mediated on April 22, 2025. [Doc. 45, ¶ 45]. ACC settled its claims with Defendants HHH, H3Co Systems LLC, and Southern Brothers Ironworks LLC, but was unable to resolve its dispute with CECO. [*Id.* at ¶ 46]. On motion by ACC, the Court dismissed ACC's claims against HHH, H3Co Systems, and Southern Brothers Ironworks. [Doc. 38]; [Doc. 39]. As part of the settlement, HHH assigned any legal claims it might have against CECO to ACC. [Doc. 45, ¶ 46].

---

[6] The remaining coordination instructions—at least in the "Steel Sliding Hangar Doors" document—are as follows. "Coordinate final design and placement between hangar door and structure with metal building system manufacturer. Refer to section 13 34 19 METAL BUILDING SYSTEMS." [Doc. 70-16, ¶ 1.7]. "Grease fittings shall be used for the sheave bearings unless permanently lubricated bearings are used. Coordinate cable anchor forces with metal building system supplier." [*Id.* at ¶ 2.2.6].

Following the mediation and resulting settlement, ACC moved to amend its Complaint on May 15, 2025, to add its newly assigned claims. [Doc. 36]. CECO informed the Court via email that it would not oppose ACC's amendment, and the Court granted ACC leave to amend on May 23, 2025—making the First Amended Complaint [Doc. 37] the operative pleading. [Doc. 40].

Then, CECO filed its Answer to the First Amended Complaint on June 10, 2025, adding "cross-claims" against HHH for breach of contract, failure to defend and indemnify, and contribution. [Doc. 43]. On July 1, 2025, ACC moved to dismiss CECO's cross-claims. [Doc. 45]. CECO responded by filing a Motion to Amend [Doc. 48][7] on July 21, 2025, and a Response in Opposition to ACC's Motion to Dismiss [Doc. 51] the next day. ACC filed a Response [Doc. 52] opposing CECO's Motion to Amend on July 31, 2025.

The Court granted CECO's Motion to Amend on August 15, 2025. [Doc. 55]. Both parties subsequently filed amended documents, which now serve as the operative pleadings. [Doc. 56 (CECO's Amended Answer)]; [Doc. 57 (ACC's Second Amended Complaint)]; [Doc. 58 [CECO's (Amended Counterclaim and Answer to the Amended Complaint)]; [Doc. 59 (ACC's Answer to the Amended Counterclaim)]. On September 17, 2025, ACC filed a Motion for Leave to file an expert rebuttal report. [Doc. 60]. The

---

[7] The same day, CECO filed an Amended Answer and Counterclaim [Doc. 49], which the Court struck as premature since ACC had not consented and the Court had not ruled on CECO's Motion to Amend. [Doc. 50].

Court granted ACC's Motion. [Doc. 64].

CECO filed its Motion for Summary Judgment on October 1, 2025. [Doc. 66].

ACC filed its own Motion for Summary Judgment the same day, along with its *Daubert*

Motion. [Doc. 72]; [Doc. 74]. CECO filed its Motion to Strike on November 5, 2025. [Doc.

83]. The Court analyzes each below.

## THE DAUBERT MOTIONS

**1.** **ACC's *Daubert* Motion to Exclude the Expert Report and Testimony of David E. Rutherford. [Doc. 74]**

The requirements for expert testimony are governed by Rule 702 of the Federal

Rules of Evidence. Fed. R. Evid. 702. This rule reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rulings on the admissibility of expert testimony—like all evidentiary rulings—

necessarily involve the exercise of the Court's discretion. *See Burchfield v. CSX Transp.,*

*Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011). Trial courts act as "gatekeepers" to ensure that

speculative and unreliable opinions do not reach the jury. *Daubert v. Merrell Dow*

*Pharms, Inc.*, 509 U.S. 579, 589 n.7 (1993). "This gatekeeping role, however, is not

intended to supplant the adversary system or the role of the jury: vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). To determine if expert testimony is admissible under Rule 702, the Court follows the Eleventh Circuit's test: "(1) the expert must be qualified, (2) his methodology must be sufficiently reliable as determined by the sort of inquiry mandated by *Daubert* . . . and (3) his testimony must assist the trier of fact." *Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646, at *3 (11th Cir. Nov. 8, 2022) (citing *United States v. Frazier*, 387 F.3d 1233, 1260 (11th Cir. 2004)).  The "'burden of establishing qualification, reliability and helpfulness'" lies with the party offering the expert opinion. *McClain v. Metabolite lnt'l. Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1260).

In its gatekeeping inquiry, the Court's focus must be on the reliability of the testimony, not simply whether it fits within the narrow confines of lawyer-urged litmus tests. While "'each stage of the expert's testimony [must] be reliable, . . . each stage must [also] be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Frazier*, 387 F.3d at 1262 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). The Court's goal is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. at 1260 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "Sometimes the specific [traditional] *Daubert* factors will aid in

determining reliability; sometimes other questions may be more useful." *Id*. at 1262. Testimony that the parties plan to present to a jury must be "'properly grounded, well-reasoned, and not speculative.'" *Id*. (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

Finally, the Court must assess whether the expert testimony helps the trier of fact. This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Id*. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262–63. "Nor does expert testimony help the trier of fact if it fails to 'fit' with the facts of the case." *Stoner v. Fye*, No. 5:15-cv-102 (CAR), 2017 WL 2434461, at *4 (M.D. Ga. June 5, 2017) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)). "Expert testimony lacks 'fit' when 'a large analytical leap must be made between the facts and the opinion.'" *Id*. (quoting *McDowell*, 392 F.3d at 1299); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. "Thus, the court may exclude otherwise reliable testimony if it does not have 'sufficient bearing on the issue at hand to warrant a determination that it [is *helpful* to the trier of fact].' "*Fye*, 2017 WL 2434461, at *4 (quoting *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1234 (10th Cir. 2005)). *Id*.

Here, ACC "moves this Court to preclude or limit the testimony of David E.

Rutherford . . . ." [Doc. 74, p. 1]. To begin, much, if not most, of ACC's complaints about Mr. Rutherford will make for fertile ground during its cross-examination of him at trial. *See, e.g.*, [Doc. 74, p. 10 (arguing that Rutherford's opinion is inadmissible because it ignores the deposition testimony of HHH and McKnight)]. After all, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Ala. Power Co.*, 730 F.3d at 1282. As the Court just signaled, it finds ACC's arguments that Rutherford's report should be excluded in its entirety unpersuasive.

First, CECO met its burden of showing reliability and helpfulness. Rutherford's experience with the Metal Building Manufacturers Association ("MBMA") certainly qualifies him to testify about the MBMA's definitions. [Doc. 74-1, p. 1]. Rutherford's opinion uses both reliable sources and concerns the facts of this case. [*Id.* at pp. 1–2, 5–6]. His opinion also "fits" the case because it provides information a lay person likely would not know, but does not contain any great logical leaps. *See* [*id.* at pp. 2–3 (providing definitions from the MBMA)]. So, the Court will not exclude the report in its entirety.

However, Rutherford's report does contain one impermissible legal conclusion. [Doc. 74-1, p. 2]. Specifically, Rutherford states that "[t]he MBMA standards and practices are specifically noted *and incorporated* into this Project . . . ." [Doc. 74-1, p. 2 (emphasis added)]. In the Court's opinion, this conclusion is somewhat vague. If Mr.

Rutherford meant that the MBMA's standards were "incorporated" into the contract in the sense that they are referenced, the Court will likely allow that. However, if Mr. Rutherford intends to testify that the MBMA standards were "incorporated" into the specifications in the legal sense, that he cannot do. He has not shown that he has the requisite training and/or experience to explain the legal concepts of incorporation or legal consequences of any such incorporation. Plus, the Court will serve as the jury's source when it comes to legal questions. As the Eleventh Circuit so eloquently put it "[w]e have repeatedly said, in a number of contexts, that we do not need, want, or accept expert testimony on questions of law." *Julmist v. Prime Ins. Co.*, 92 F.4th 1008, 1022 (11th Cir. 2024); *see also Johnson v. Hartford Fin. Servs. Grp., Inc.*, No. 1:20-cv-02000-SDG, 2021 WL 37573, at *1331 (N.D. Ga. Jan. 4, 2021) (stating that under Georgia law, the construction and interpretation of a contract is a matter of law for the court) (quoting *Landmark Am. Ins. Co. v. Khan*, 705 S.E.2d 707, 710 (2011)).

Again, Mr. Rutherford may not testify as to any legal conclusions, specifically including any testimony about the legal effect of any "incorporated" design standards into the Robins Project contract. The Court **DENIES in part** ACC's *Daubert* Motion to Exclude the Expert Report and Testimony of David E. Rutherford, and **EXCLUDES** any testimony about questions of law, legal standards or legal consequences associated with the contract.

2.    **CECO's Motion to Strike Plaintiff's Untimely Disclosed Expert Report [Doc. 83]**

Parties must disclose the identity of any expert who may testify at trial. Fed. R. Civ. P. 26(a)(2)(A). Unless otherwise ordered by the court, when a witness is "retained or specially employed to provide expert testimony in the case," "this disclosure must be accompanied by a written report." *Id.* at (a)(2)(B). The report must include:

> **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
> **(ii)** the facts or data considered by the witness in forming them;
> **(iii)** any exhibits that will be used to summarize or support them;
> **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;
> **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

*Id.* When an expert witnesses is not "retained or specially employed to provide expert testimony in the case," they are "not required to provide a written report," but their disclosure must include "the subject matter on which the witness is expected to present evidence" and **"**a summary of the facts and opinions to which the witness is expected to testify." *Id.* at (a)(2)(C).

The timeliness of these disclosures is generally governed by court order or stipulation between the parties. *Id.* at (a)(2)(D). In the absence of such an order or stipulation, "the disclosures must be made . . . at least 90 days before the date set for

trial or for the case to be ready for trial," or, for evidence offered only to contradict or rebut another party's expert witness testimony on the same subject matter, "within 30 days after the other party's disclosure." *Id.* These disclosure requirements "are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise"; as such, "compliance with the requirements of Rule 26 is not merely aspirational." *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) (citation omitted).

A party that "fails to provide information or identify a witness as required by Rule 26(a) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 823 (11th Cir. 2009). An insufficient or untimely failure is "substantially justified" if "reasonable people could differ as to the appropriateness of the contested action." *Maddow v. Proctor & Gamble Co., Inc.*, 107 F.3d 846, 853 (11th Cir. 1997). To determine whether such a failure is "harmless," courts consider several factors such as: the surprise to the party entitled to the disclosure; that party's ability to cure the surprise; the extent to which allowing the evidence would disrupt the trial; the importance of the evidence; the non-disclosing party's explanation for its failure; and the prejudice to the opposing party if the witness is allowed to testify. *Hackler v. Gen. Motors LLC*, 2022 WL 16951664, at *3 (S.D. Ga. Nov. 15, 2022) (collecting cases); *see Roberts v. Phila. Express Tr.*, 2023 WL 6878744, at *4 (S.D. Ga. Jan. 28, 2011) (citation omitted) ("[A] failure to timely make the

required disclosures is harmless when there is no prejudice to the party entitled to the disclosure.").

When reviewing a district court's exclusion of an expert witness under Rule 37, appellate courts consider "the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party" if the witness is allowed to testify. *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1321 (11th Cir. 2008) (citation omitted); *see also Bearint ex rel. Bearint v. Dorell Juv. Grp., Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004). Notably, "the first and third factors, together, can outweigh the second." *Id.* (citation omitted); *see also Bearint*, 389 F.3d at 1353 (affirming the exclusion of an expert witness due to "the reasons for the delay . . . and the consequent prejudice that [the] testimony would have caused" the nonmoving party, "[r]egardless of the importance of [the] testimony"). All that to say, district courts have broad discretion in deciding these matters.

The burden of demonstrating that an insufficient or untimely disclosure was substantially justified or harmless lies with the non-disclosing party. *See Mitchell*, 318 F. App'x at 824. Only in cases "where the court imposes the most severe sanction—default or dismissal—is a finding of willfulness or bad faith failure to comply" with a discovery order necessary. *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1320 (11th Cir. 2014).

Here, ACC submitted the Ankura Report. [Doc. 60-3]. The Ankura Report was drafted by Brian Dance and Sam Haagenson. [*Id.* at p. 1]. Brian Dance is a licensed

structural engineer and a licensed professional engineer, and Sam Haagenson is an architect. [*Id.* at p. 6]. In submitting this report, ACC missed not one, but two Rule 26 deadlines. ACC proffered the Ankura Report—the report at issue—on September 17, 2025. [Doc. 60]. That was 47 days after the Court's deadline set in the Scheduling and Discovery Order, and 17 days after Rule 26's rebuttal report deadline. [Doc. 41]; [Doc. 60]; Fed. R. Civ. P. 26(a)(2)(D).

The Scheduling and Discovery Order, entered on June 9, 2025, set the deadline to serve supplemental expert reports for August 1, 2025. [Doc. 41, p. 10]. In the September 30, 2025, conference, the Court reminded the parties that they drafted and submitted the discovery order. [Doc. 41]. The Court approved it, of course, but the parties set the deadlines. Therefore, there is little room for debate here. ACC knew the deadline to submit and serve supplemental expert reports was August 1, 2025, because ACC assisted in drafting that deadline. [*Id.* at p. 10]. Furthermore, this is not an instance where ACC found a new expert to rebut a novel argument or a new expert from CECO. At the time the August 1, 2025, date was set, ACC had already disclosed the names of the experts who drafted the Ankura Report. *See* [*id.*]. Instead of following the order it helped draft, ACC let the August 1, 2025, deadline pass without serving any expert

reports.[8]

ACC argues that the Ankura report is a rebuttal to CECO's expert David Rutherford. [Doc. 85, p. 2]. CECO responds that ACC may have labeled the Ankura Report as a rebuttal report, but in reality, it's a full-blown initial expert report that ACC should have served by August 1, 2025. [Doc. 83, p. 3]. A review of the Ankura report reveals this argument to be true, at least in part. [Doc. 60-3].

The first portion of the report does seem to be a rebuttal to Rutherford's report. [*Id.* at pp. 9–16]. In it, ACC's experts make some of the same arguments ACC made in its *Daubert* motion discussed above. *Compare, e.g.*, [*id.* at p. 9], *with* [Doc. 74, p. 4]. Nestled into the remainder of the report, though, is information that does not directly respond to Rutherford's report. [Doc. 60-3, pp. 17–22]. In this portion of the Ankura Report, ACC's experts analyze CECO's alleged errors in its bid documents—something Rutherford never delved into in his report. [*Id.* at pp. 17–20].

While this is not sufficient to make the report a "primar[il]y engineering and architectural report" as CECO claims, it is sufficient to call into question whether ACC truly submitted the Ankura Report with the sole intent "to contradict or rebut evidence" in Rutherford's report. [Doc. 83, p. 4]; [Doc. 60, p. 4]. ACC's intent is further

---

[8] The Court previously gave ACC leave to file the Ankura Report. [Doc. 64]. The Court did so to get the Report in the record in case CECO later disputed it. It's also true that the Court granted the motion before CECO had its full 21 days to respond. Now, upon a second look at the Report, and with the benefit of full briefing by the parties, the Court exercises its considerable discretion to strike the report because it was unjustifiably late.

called into question by its attempt to use the Ankura report in its Response to CECO's Motion for Summary Judgment. [Doc. 76, p. 12]. In fact, in its Response, ACC specifically cites the portions of the Ankura Report that do not directly respond to Rutherford's report—pages 17 to 21—to substantively dispute CECO's Motion. [*Id.* at p. 12 n.17 (citing Doc. 60-3, pp. 17–21)]. For these reasons, the Court finds the non-rebuttal portion of ACC's report improper.

In its Response, ACC argues that no harm occurred from its untimely disclosure. [Doc. 85, p. 5]. The Court disagrees. Discovery ended on September 29, 2025. [Doc. 41, p. 3]. ACC attempted to file the Ankura Report on September 17, 2025. That left CECO with less than two weeks to depose ACC's experts that drafted the Ankura Report— experts that were presumably dropped when ACC did not file expert reports by August 1, 2025—and draft any motions, which, at that point, were also due on September 29, 2025. [*Id.* at p. 11]. Meanwhile, CECO submitted Rutherford's report on August 1, 2025. [Doc. 60-2, p. 1]. ACC had over six weeks after the submission of Rutherford's report to depose him, analyze the report, draft any related motions, etc., but left CECO with less than two weeks to do the same for experts ACC disclosed but whose reports ACC did not timely serve, and a report that purports to be a rebuttal but contains novel arguments.

Accordingly, despite previously giving ACC permission to file the late report, the Court **GRANTS** CECO's Motion to Strike Plaintiff's Untimely Disclosed Expert

Report for being untimely and for portions of it not being a rebuttal. [Doc. 83]. *See Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 717–719 (11th Cir. 2019) (affirming exclusion of late disclosed expert report); Fed. R. Civ. P. 37(c). And, without any timely disclosed report, the Federal Rules of Civil Procedure forbid the authors of the Ankura Report from testifying. *See* Fed. R. Civ. P. 26(a)(2). In the end, the Court simply chooses to enforce the deadlines that the parties set for each other.

## THE MOTIONS FOR SUMMARY JUDGMENT

### 1.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The interpretation of the written contract between parties is properly subject to disposition by summary judgment." *Associated Mech. Contractors, Inc. v. Martin K. Eby Const. Co.*, 964 F. Supp. 1576, 1579 (M.D. Ga. 1997) (internal citation omitted). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial responsibility of informing the court of the basis for

its motion. *Four Parcels*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Importantly, "[w]hen the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up).

If the moving party satisfies this initial burden, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Finally, "all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Anderson*, 477 U.S. at 255. And "if a reasonable jury could make more than one

inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020).

**2.      CECO's Motion for Summary Judgment [Doc. 66]**

In its Motion for Summary Judgment, CECO argues that all the claims ACC asserted against it fail as a matter of law. [Doc. 66, p. 2]. As a review, ACC asserted five claims against CECO in its Second Amended Complaint:

Count 1 - Breach of Contract (via assignment from HHH) [Doc. 57, p. 9];

Count 2 - Promissory Estoppel [*Id.* at p. 10];

Count 3 - Negligence (via assignment from HHH) [*Id.* at p. 12];

Count 4 - Declaratory Judgment [*Id.* at p. 14];

Count 5 - Attorney's fees [*Id.* at p. 15].

To review CECO's arguments, Count 1 fails "because of the *Spearin* Doctrine and ACC's failure to provide complete design documents." [Doc. 66, p. 2 (italics added)]. Count 2 fails because of the Spearin Doctrine, the existence of a contract between the parties, conditional pricing, and unreasonable reliance. [*Id.*]. Count 3 fails because there is no duty here other than contractual duty, and there is no damage to persons or property. [*Id.*]. Count 4 fails because "the breach has already occurred, no future conduct is at-issue, and there is nothing to 'declare.'" [*Id.* at p. 3]. Lastly, CECO argues that Count 5 fails because the other claims are subject to summary judgment. [*Id.*]. The

Court takes each of CECO's arguments against each of ACC's claims in turn.

Before analyzing the arguments, though, the Court must first address a violation of its local rules. Local Rule 56 requires the movant on a motion for summary judgment to attach a statement of material facts to which the movant argues there is no genuine dispute. LR56, MDGa. The rule then requires the respondent to the motion for summary judgment to submit their own statement of material facts to which they contend there is a genuine dispute. *Id.* "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id.*

ACC's Response to CECO's Motion for Summary Judgment fails under Local Rule 56. *See* [Doc. 84, p. 1]; *see generally* [Doc. 76]. While ACC's Response does cite to specific parts of the record and attempts to specifically contradict certain parts of CECO's statement of undisputed material facts,[9] ACC did not file its own separate statement of disputed material facts. *See, e.g.,* [*id.* at pp. 2–3]. Therefore, under Local Rule 56, all facts in CECO's statement of undisputed facts are deemed admitted. LR56, MDGa. The admitted facts apply *only to this Motion*. In accordance with this finding, the Court addresses each of CECO's arguments below.

First, CECO argues that Count 1, breach of contract, fails under the *Spearin*

---

[9] ACC's Response specifically addresses paragraphs 5–15 of CECO's Statement of Undisputed Material Facts. [Doc. 76, pp. 3, 10, 15].

doctrine and Georgia assignment law. [Doc. 66, pp. 9–12]. Notably, ACC does not rebut CECO's arguments with any citations to legal authority. *See* [Doc. 76, pp. 12–13].  CECO argues that the plans from the USACE did not provide the loads on the hangar doors, which was what CECO had to re-calculate. [Doc. 76, p. 13].

Since the *Spearin* doctrine can preclude recovery for this claim entirely, the Court begins there. The *Spearin* Doctrine states that "if a contractor is required to 'build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.'" *Ashton Park Trace Apartments, LLC v. City of Decatur, Georgia*, No. 1:14-CV-4056-MHC, 2017 WL 5474023, at *9 n.11 (N.D. Ga. Feb. 24, 2017) (quoting *United States v. Spearin*, 248 U.S. 132, 136 (1918)). Under the *Spearin* Doctrine, "the government warrants that its directions are not defective" "[i]n exchange for the right to direct specifically how a project shall be performed[.]" *Martin K. Eby Const. Co. v. Jacksonville Transp. Auth.*, 436 F. Supp. 2d 1276, 1308 (M.D. Fla. 2005), *aff'd*, 178 F. App'x 894 (11th Cir. 2006). "The *Spearin* implied warranty, however, does not apply to performance specifications." *Sheffield Korte Joint Venture v. Sec'y of the Army*, No. 2024-1134, 2025 WL 1466934, at *2 (Fed. Cir. May 22, 2025), *cert. denied sub nom. Sheffield Korte Joint Venture v. Driscoll*, No. 25-560, 2026 WL 79969 (U.S. Jan. 12, 2026) (citations omitted).  "Unlike design specifications, which explicitly state how the contract is to be performed and permit no deviations, performance specifications specify the results to be obtained and leave it to the

contractor to determine how to achieve those results." *Id.* (quoting *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987)). The Supreme Court of Georgia adopted the *Spearin* Doctrine in 1928. *Decatur Cnty. v. Praytor, Howton & Wood Contracting Co.*, 142 S.E. 73, 81 (Ga. 1928).

In its statement of undisputed material facts, CECO says that the "USACE, the owner, failed to provide complete plans for the Project; particularly as it relates to the PEMBs interaction with the custom hangar doors and the loads." [Doc. 66-1, ¶ 8]; *see also* [*id.* at ¶ 10 ("USACE and ACC did not provide CECO all the information on the hangar doors")]. However, CECO's statement of undisputed facts does not provide enough evidence to conclude whether the specifications at issue were design specifications or performance specifications. Therefore, the Court looks to the entire record. At the outset, the Court finds USACE's specifications regarding the hangar doors are a mix of design and performance specifications. [Doc. 70-16, p. 4]; [Herron Depo. II, p. 72:21–24]; [Herron Depo. I, p. 88:10–25].

Specifically, the section on the design of the "Steel Door Components" requires the bracing and framing to be designed "in accordance with the *specified loads* and" referenced publications. [Doc. 70-16, pp. 3–4 (emphasis added)]. What are the specified loads? For one, more referenced publications. [*Id.* at p. 4]. But, the section below "loads" also discusses wind load, and says to "[c]oordinate with metal building supplier" for the "deflections of the door header structure." [*Id.*]. Further on, the specifications say to

"[c]oordinate final design and placement between hangar door and structure with metal building system manufacturer." [*Id.* at p. 6]. Even though this was a bid-build contract, the Court concludes that—at a minimum and based on what is currently in the record—the section on "Deflections" is a performance specification.[10] This section was specifically for the wind loads on the hangar doors, and the loads on the doors are what CECO identified as the problem point. [Doc. 66-1, ¶¶ 8–10, 23]. This section does provide general requirements for the final product, but it does not provide detailed instructions to achieve that final product that are necessary to be a design specification. Instead, the job of reaching the general requirements is left to the door supplier and building supplier. As a performance specification, the *Spearin* doctrine does not apply. *Sheffield*, 2025 WL 1466934, at *2.

CECO also argues that ACC impermissibly expanded the rights assigned to it by HHH. [Doc. 66, p. 9]. Georgia law allows a party to assign contractual rights and the right to bring a lawsuit under a contract. *See* O.C.G.A. § 44-12-22; *Fed. Deposit Ins. Corp. for NetBank, FSB v. First Am. Title Ins. Co.*, No. 1:10-cv-3032-WSD, 2012 WL 13005309, at *10 (N.D. Ga. Mar. 15, 2012). "[A]n assignee stands in the shoes of the assignor and

---

[10] For clarity, the full section is as follows:

> For any door member, the deflection due to design wind load shall not exceed the member's length divided by 120 or as indicated on the Structural drawings. Deflection shall be checked based on a 10 year mean recurrence interval wind speed, as shown on Structural drawings.
> Design Doors as a system to withstand the upward and downward deflections of the door header structure. Coordinate with metal building supplier.

[Doc. 70-16, ¶ 1.4.3].

obtains no greater rights than the assignor possessed at the time of assignment." *S. Telecom, Inc. v. TW Telecom of Georgia L.P.*, 741 S.E.2d 234, 237 (Ga. Ct. App. 2013) (quoting *Fouche v. Brower*, 74 Ga. 251, 264 (1885)). Assignees cannot expand the rights transferred from an assignor. *Id.* (citing *Algernon Blair, Inc. v. National Surety Corp.*, 151 S.E.2d 724 (Ga. Ct. App. 1996)).

Here, HHH assigned ACC all rights and causes of action HHH had against CECO. [Doc. 57-4, p. 1]. The exact language from the agreement is:

> Assignors hereby irrevocably assign, transfer, and set over to the Assignee all of the Assignors' rights, title, and interest in and to all claims, demands, rights, causes of action, or suits, whether legal or equitable, known or unknown, that the Assignors have or may have against Robertson-Ceco II Corporation d/b/a Ceco Building Systems ("CECO") . . . This includes all events and circumstances that form the basis of the claims asserted in [this case].

[Doc. 68-1, p. 1]. CECO argues that ACC is limited to whatever damages HHH was entitled to recover from CECO under the Builder Agreement, rather than the $3,937,232.00 ACC claims. [Doc. 66, p. 10]. Rather than the Builder Agreement, ACC asserts its claim in its Second Amended Complaint is for the breach of CECO and HHH's "subcontract agreement."[11] [Doc. 57, ¶ 62]. According to ACC, that "subcontract

---

[11] The Court notes that ACC asserted its own breach of contract claim in the original complaint. [Doc. 1, p. 7]. ACC dropped that claim, now asserting only the assigned breach of contract claim from HHH. [Doc. 57, ¶¶ 65–66]; *see also McPipkin v. Auto-Owners Ins. Co.*, No. 7:24-cv-99 (WLS), 2024 WL 4680667, at *1 (M.D. Ga. Nov. 5, 2024) ("Generally, an amended complaint supersedes the original complaint.").

agreement" was "to provide specified goods and services at a fixed price."[12] [*Id.* at ¶ 61].

Even the most basic piece of a breach of contract claim is at issue here: which contract

applies. Not to mention the terms of the "subcontract agreement" ACC alleges existed,

or—and what precludes summary judgment—whether CECO breached the contract.

*Borgh v. Gentry*, 953 F.2d 1309, 1311 (11th Cir. 1992) (stating that the issue of whether a

contract has been breached is a jury question); *see also Rise v. GAPVT Motors, Inc.*, 653

S.E.2d 320, 322 (Ga. Ct. App. 2007) (same). Accordingly, CECO's Motion for Summary

Judgment as to Count 1 is **DENIED**. There is sufficient factual dispute over the issue of

breach to warrant a trial.

Second, CECO argues that ACC's promissory estoppel claim is not actionable.

[Doc. 66, p. 14]. "Georgia law recognizes the doctrine of promissory estoppel." *Turks v.*

*Bank of Am.*, 742 F. App'x 470, 473 (11th Cir. 2018) (citing *Zhong v. PNC Bank, N.A.*, 812

S.E.2d 514, 525 (Ga. Ct. App. 2018)). However, "estoppels are not favored by Georgia

law, and the party asserting a promissory estoppel bears the burden of proving all

elements of the claim." *Mouzin Bros. Farms, LLC v. Dowdy*, No. 7:20-cv-197 (TQL), 2023

WL 11965338, at *4 (M.D. Ga. Sept. 14, 2023) (quoting *Woodstone Townhouses, LLC v.*

*Southern Fiber Worx, LLC*, 855 S.E.2d 719, 734 (Ga. Ct. App. 2021)). The elements of

promissory estoppel in Georgia are: "the defendant made a promise upon which he

---

[12] Notably, ACC's Response fails to shed light on what the breached agreement is, alleging generally that "CECO breached its agreement with Jerry Herron d/b/a HHH Building Sales." [Doc. 76, p. 9].

reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right." *Id.* (quoting *Mbigi v. Wells Fargo Home Mortg.*, 785 S.E.2d 8, 20 (Ga. Ct. App. 2016)); *see also* O.C.G.A. § 13-3-44(a). "A plaintiff may not base a claim of promissory estoppel on vague or indefinite promises." *Id.* (citing *Mbigi*, 785 S.E.2d at 20). Also, an "implied understanding is not sufficient to constitute a promise under promissory estoppel." *Mouzin*, 2023 WL 11965338, at *4 (quoting *Woodstone*, 855 S.E.2d at 734). Furthermore, "[r]easonable reliance is an issue of fact under Georgia law." *Turks*, 742 F. App'x at 473 (citing *Reynolds v. CB&T*, 805 S.E.2d 472, 478 (Ga. Ct. App. 2017)). Finally, "[t]he existence of a valid contract generally bars a claim for promissory estoppel if the terms of the contract give rise to the claim." *Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1341 (N.D. Ga. 2021) (citing *Bank of Dade v. Reeves*, 354 S.E.2d 131, 133 (Ga. 1987)); *see also Blau v. Blau*, 890 S.E.2d 50, 56 (Ga. Ct. App. 2023).

There is no written contract on the record between CECO and ACC. Furthermore, no reasonable jury could find that there was a non-written contract between CECO and ACC. ACC reached out to HHH, not CECO, about the Robins Project. [Doc. 66-1, ¶ 4]; [McKnight Depo., pp. 30:16–24, 33:1]. HHH, not CECO, submitted a bid to ACC. [McKnight Depo., pp. 35–36:20–3]; [Doc. 71-2]. CECO did not submit its estimate to ACC, but instead submitted it to HHH. [Herron Depo. I, pp. 53:15–54:7]; [Doc. 70-15, p. 2]. HHH's bid was not the same as CECO's bid. *Compare*

[Doc. 70-11], *with* [Doc. 70-15], *also with* [Doc. 71-2]. ACC has provided no caselaw that would make this system a joint bid or make HHH's bid a bid on behalf of CECO. Furthermore, ACC awarded the PEMB portion of the project to HHH, not CECO. [Doc. 66-1, ¶ 21]; [Doc. 71-2]. And, CECO initially notified HHH, not ACC, of the problems it was having with its calculations. [Doc. 71-7, p. 16]; [Doc. 70-5, pp. 5–6]. In other words, the actions that would lead to contractual formation here occurred either between ACC and HHH or between HHH and CECO, but didn't occur between ACC and CECO.

Additionally, a dispute of material fact about whether HHH was an agent of CECO would not preclude summary judgment here. As stated, CECO made no promises directly to ACC, but instead only made promises to HHH. [Herron Depo. I, pp. 53:15–54:7]; [Doc. 70-15, p. 2]. ACC is not bringing this claim as an assigned claim from HHH, but instead directly against CECO. [Doc. 57, p. 10]. Therefore, the only tie ACC has to CECO's promises is HHH. If HHH wasn't an agent of CECO, ACC has no promises on which to base an estoppel claim without proof of direct ties to CECO. If HHH was an agent of CECO, then there was a valid agreement between ACC and

HHH/CECO, which bars an estoppel claim in Georgia.[13] *Shea*, 533 F. Supp. 3d at 1341

(citing *Bank*, 354 S.E.2d at 133 (Ga. 1987)); *see also Blau*, 890 S.E.2d at 56 (Ga. Ct. App.

2023). CECO's Motion for Summary Judgment as to Count 2 is **GRANTED**.[14]

Third, CECO argues that Count 3 is duplicative of Count 1. [Doc. 66, p. 15].

Count 3 is a negligence action based on the assigned claims from HHH to ACC. [Doc.

57, ¶ 83]. To establish a cause of action for negligence under Georgia law, a plaintiff

must show "the existence of a legal duty; breach of that duty; a causal connection

between the defendant's conduct and the plaintiff's injury; and damages." *Crawford v.

Marriott Int'l, Inc.*, No. 21-11647, 2021 WL 5054442, at *2 (11th Cir. Nov. 1, 2021) (quoting

*Handberry v. Manning Forestry Servs., LLC*, 836 S.E.2d 545, 548 (Ga. Ct. App. 2019)). "A

legal duty sufficient to support liability in negligence is either a duty imposed by a

valid statutory enactment of the legislature or a duty imposed by a recognized common

law principle declared in the reported decisions of Georgia's appellate courts." *Id.*

(quoting *Sheaffer v. Marriott Int'l, Inc.*, 826 S.E.2d 185, 188 (Ga Ct. App. 2019)) (alterations

---

[13] Finally, the case cited by ACC does not apply here. [Doc. 76, p. 4 n.2]. In *APAC-SE., Inc. v. Coastal Caisson Corp.*, the District Court for the Northern District of Georgia said that the contractor submitting a "prime bid" may invoke promissory estoppel against the subcontractor who submitted their bid to the "prime bid" contractor "*in order to prevent the subcontractor from revoking its bid*[.]" 514 F. Supp. 2d 1373, 1378 (N.D. Ga. 2007) (citing *Drennan v. Star Paving Co.*, 51 Cal. 2d 409, 413–14 (1958)). ACC is the "prime bid" contractor—the general contractor who submitted the final bid to the USACE—but CECO is not the subcontractor who submitted a bid to ACC. That was HHH. Furthermore, ACC is not claiming promissory estoppel here to prevent CECO from revoking its bid. ACC has already contracted with Vulcan to fill CECO's place, and construction is on the way. Therefore, *APAC-SE* does not apply here.

[14] If ACC intended to bring this promissory estoppel claim against CECO as the assignee of Herron, it would still fail given the contract that existed between HHH and CECO as explained above.

accepted). "[A] defendant's failure to perform a contractual duty cannot serve as the basis for a negligence claim." *Deotare v. Wells Fargo Bank, N.A.*, No. 1:17-cv-699-WSD, 2018 WL 1370897, at *7 (N.D. Ga. Mar. 26, 2018) (citing *Traina Enters., Inc. v. RaceTrac Petroleum, Inc.*, 525 S.E.2d 712, 714 (Ga Ct. App. 1999)).

Additionally, under Georgia law, "[d]amages are given as compensation for injury . . . ." O.C.G.A. § 51-12-4. Therefore, "[u]nder Georgia law, an injury to a person or damage to property is required before tortious conduct is actionable." *MCI Commc'ns Servs. v. CMES, Inc.*, 728 S.E.2d 649, 651 (Ga. 2012) (citation omitted). "Moreover, excluding the situations where the law presumes injury, a negligent act does not result in tortious conduct unless and until an injury to a person or damage to property has been caused." *Id.* (citations omitted).

Here, ACC has not pointed to a statute or court decision establishing a duty for CECO. Instead, in its Second Amended Complaint, ACC merely alleges that "CECO owed a duty to HHH to ensure that the information provided and relied upon was sufficient and accurate." [Doc. 57, ¶ 91]. ACC did not clarify the source of this alleged duty in its Response to CECO's Motion to Dismiss. *See* [Doc. 76]. ACC also has not established an injury to a person or damage to property. Therefore, ACC's claim does not survive summary judgment.

Additionally, CECO points to the economic loss rule as a reason to grant summary judgment. The economic loss rule states that "a contracting party who suffers

purely economic losses must seek his remedy in contract and not in tort." *Am. Mgmt.*

*Servs. E., LLC v. Fort Benning Fam. Communities, LLC*, 774 S.E.2d 233, 247 (Ga. Ct. App.

2015); *Gen. Elec. Co. v. Lowe's Home Centers, Inc.*, 608 S.E.2d 636, 637 (Ga. 2005). To

recover in tort under the economic loss rule, the duty breached must not arise solely by

virtue of the contract. *AM. Mgmt. Servs.*, 774 S.E.2d at 248. Once again, ACC has not

pointed the Court to any source for CECO's alleged duty. The only source for such a

duty would be a contract between CECO and HHH. Accordingly, the Court **GRANTS**

Defendant's Motion for Summary Judgment as to Count 3.[15]

Fourth, CECO argues that Georgia's Declaratory Judgment Act "has no

application" to Count 4 because Count 4 "involves past conduct, no future conduct is

concerned, and there is an adequate remedy available at law[.]" [Doc. 66, p. 17]. Count 4

is a declaratory judgment action under Georgia's Declaratory Judgment Act. [Doc. 57, ¶

98 (citing O.C.G.A. § 9-4-1 *et seq.*)]. Specifically, ACC seeks a declaration that (1)

"Defendant submitted a valid bid," (2) "[t]hat bid constitutes a contract between the

Parties," and (3) "ACC was reasonable in relying on that bid." [Doc. 57, ¶ 101]. Looking

to Georgia's Declaratory Judgment Act, it

> authorizes courts to declare rights and other legal relations of any interested
> party in cases of actual controversy under O.C.G.A. § 9-4-2 (a) and in any

---

[15] Alternatively, ACC's organization in its Response does not match CECO's Motion for Summary Judgment. *Compare* [Doc. 76], *with* [Doc. 66]. As a result, it is difficult to decipher the arguments to which ACC responded. With that said, ACC does not specifically address CECO's arguments for Count 3 in its Response. Therefore, Count 3 is considered abandoned, and CECO's Motion for Summary Judgment is **GRANTED** as to Count 3 alternatively on that ground. *See Bulluck v. Newtek Small Bus. Fin., Inc.*, 808 F. App'x 698, 702 (11th Cir. 2020); *see also Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1342 (11th Cir. 2009).

civil case in which it appears to the court that the ends of justice require that the declaration should be made under O.C.G.A. § 9-4-2(b). Under O.C.G.A. § 9-4-2(a), the idea of an actual controversy is often described as standing to bring the suit, and subsection (b) of the Act broadens the scope of the Declaratory Judgments Act beyond actual controversies to include justiciable controversies. [Georgia's] Supreme Court has defined the term "justiciable controversies" as the existence of circumstances showing a necessity for a determination of the dispute to guide and protect the plaintiff from uncertainty and insecurity with regard to the propriety of some future act or conduct, which is properly incident to his alleged rights and which if taken without direction might reasonably jeopardize his interest.

*Fraser v. Glynn Cnty.*, 922 S.E.2d 825, 831 (Ga. Ct. App. 2025) (quoting *Publix Super Mkt. v. Rockdale Cnty.*, 913 S.E.2d 851, 854 (Ga. Ct. App. 2025)) (alterations accepted).

Additionally, "it is well established that a declaratory judgment action is inappropriate where a declaration of rights would not direct the plaintiff's future conduct or where such action involved only a determination of rights that had already accrued." *Id.* (quoting *Cobb Cnty. v. Floam*, 901 S.E.2d 512, 519 (Ga. 2024)). At its core, "[a] request for declaratory relief is a request for prospective relief—relief from the threat of wrongful acts and injuries yet to come." *Cobb Cnty.*, 901 S.E.2d at 520 (quoting *Lathrop v. Deal*, 801 S.E.2d 867, 885 (Ga. 2017)).

Here, ACC has not alleged or established any future conduct that would be impacted by any of the declarations it seeks. Nor has ACC alleged any future injuries or wrongful acts that necessitate prospective relief. In fact, the Robins Project is underway with Vulcan filling CECO's empty shoes. [McKnight Depo., pp. 118:25–119:24]. Any injury from CECO's alleged breach has already occurred. Accordingly, the Court

**GRANTS** Defendant's Motion for Summary Judgment as to Count 4.[16]

Fifth, CECO argues that Count 5 should fail because all other claims fail and Count 5—ACC's claim for attorney's fees—is "only viable if other independent claims are still viable." [Doc. 66, p. 18]. Since the Court has not granted summary judgment for all of ACC's claims, this argument must fail. Alternatively, CECO argues that there is no "good evidence in the record that CECO acted in bad faith, was stubbornly litigious[], or caused any unnecessary trouble and expense because any deficiency in CECO's numbers . . . was the result of defective and incomplete plans provided by USACE and ACC . . . ." [*Id.* at p. 19].

ACC brings its claim for attorney's fees under O.C.G.A. § 13-6-11, specifically for bad faith. [Doc. 57, ¶ 105]. Section 13-6-11 reads: "[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has *acted in bad faith*, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." O.C.G.A. § 13-6-11 (emphasis added).

Bad faith "requires more than simply bad judgment or negligence, but instead it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will."

---

[16] Similar to Count 3, ACC does not specifically address Count 4 in its Response. *See* note 11, *supra.* Therefore, Count 4 is considered abandoned, and CECO's Motion for Summary Judgment is **GRANTED** as to Count 4 alternatively on that ground. *See Bulluck*, 808 F. App'x at 702; *see also*, 572 F.3d at 1342.

*Fulks v. Balmonte*, No. 4:23-CV-00196-WMR, 2025 WL 4060080, at *4 (N.D. Ga. Oct. 2, 2025) (quoting *Rapid Group, Inc. v. Yellow Cab of Columbus, Inc.*, 557 S.E.2d 420, 426 (Ga. Ct. App. 2001)). "If there is no evidence to support a finding of bad faith, then summary judgment is warranted on a claim under O.C.G.A. § 13-6-11." *Brooks v. AK Creation, LLC*, No. 3:22-CV-103 (CDL), 2023 WL 6406367, at *2 (M.D. Ga. Oct. 2, 2023).

ACC argues that the conduct described in Count 1 constitutes bad faith. [Doc. 57, ¶ 105]. That conduct, in ACC's words, is CECO "repudiating its obligations" after ACC relied upon CECO's calculations to submit its bid. [*Id.* at ¶ 63]. In its Response to CECO's Motion for Summary Judgment, ACC presented evidence of CECO's expertise in PEMBs, and its experience working on similar projects. [Doc. 76, p. 3]. Although admittedly not a direct repudiation of CECO's assertion that its actions were not made in bad faith, ACC's arguments about CECO's expertise and role in this project mean the Court cannot say that no reasonable jury would not find bad faith. Therefore, CECO's Motion for Summary Judgment as to Count 5 is **DENIED**.

In sum, the Court **GRANTS in part** CECO's Motion for Summary Judgment. The Court **GRANTS** CECO's Motion for Summary Judgment as to Counts 2, 3 and 4 of ACC's Second Amended Complaint. The Court **DENIES** CECO's Motion for Summary Judgment as to Counts 1 and 5 of ACC's Second Amended Complaint. There is simply enough of a factual dispute for ACC to proceed with its claims for breach of contract and attorney's fees.

3.     **ACC's Motion for Summary Judgment**

ACC also filed a Motion for Summary Judgment on CECO's counterclaims. [Doc. 72, p. 1]. CECO's three counterclaims are: breach of contract, failure to defend and indemnify, and contribution. [Doc. 58, pp. 17–19]. CECO brings these counterclaims against ACC as the assignee of HHH. [*Id.* at p. 17]. ACC argues that the assignment from HHH to ACC did "not transfer or substitute HHH's Builder Agreement duties or obligations to ACC." [Doc. 72, p. 10]. ACC also argues that CECO is precluded from seeking contribution by Georgia's contribution and apportionment statutes. [*Id.* at p. 10]. The Court takes each argument in turn.

First, the breach of contract and indemnity claims.[17] In its arguments, ACC concedes that, "as HHH's assignee, CECO may raise these allegations as defenses to ACC's claims. It cannot, however, transform those provisions into affirmative counterclaims against ACC." [*Id.* at p. 15]. In response, CECO also concedes that "the indemnity claim . . . may be more appropriately cast as an affirmative defense, as acknowledged by ACC." [Doc. 79, p. 14]. CECO concludes by stating that it "trusts the Court to determine whether the indemnity claim is more appropriate as an affirmative defense rather than an affirmative claim." [*Id.* at p. 16].

Federal Rule of Civil Procedure 56 states that "[a] party may move for summary

---

[17] In its Motion, ACC lumped these claims together. *See* [Doc. 72, p. 12 ("CECO's counterclaims based on the Builder Agreement . . . .")]. CECO also appeared to do the same at first in its Response. [Doc. 79, p. 14 (". . . the breach of cont[r]act/indemnity claim . . . .")].

judgment, identifying *each claim or defense* . . . on which summary judgment is sought."
Fed. R. Civ. P. 56(a) (emphasis added). Regardless of the form of the indemnity claim,
CECO will bear the burden of proof at trial. *Brown v. State*, 793 S.E.2d 573, 576 (Ga. Ct.
App. 2016) (stating that a defendant bears the burden of proof at trial for an affirmative
defense); *Cochran v. Ogletree*, 536 S.E.2d 194, 197 (Ga. Ct. App. 2000) (". . . in support of
its counterclaim . . . the defendants had burden of proof, not the plaintiff."). Therefore,
the Court's substantive summary judgment analysis stays the same regardless of
whether these are claims or defenses, so the Court analyzes the two claims together
below. *See Wint v. Neurosurgical Grp. of Chattanooga, P.C.*, No. 4:11-cv-0185-HLM, 2013
WL 10178335, at *18 (N.D. Ga. Jan. 22, 2013).

Under Georgia law, "[a]n assignment is an absolute, unconditional, and
complete transfer of all right, title, and interest in the property that is the subject of the
assignment, with the concomitant total relinquishment of any control over the
property." *Naik v. Hyde Park Homes, Inc.*, 899 S.E.2d 271, 273 (Ga. Ct. App. 2024) (quoting
*Allianz Life Ins. Co. of N. Am. v. Riedl*, 444 S.E.2d 736, 738 (Ga. 1994)). "An assignment is a
contract and, in order to be valid, must possess the same requisites (parties, subject
matter, mutual assent, consideration) as any other contract." *Naik*, 899 S.E.2d at 273
(quoting *Bank of Cave Spring v. Gold Kist*, 327 S.E.2d 800, 802 (Ga. Ct. App. 1985)). The
property subject to assignment extends to "all choses in action arising upon contract . . .
." O.C.G.A. § 44-12-22. The question here is: does the assignee also acquire the

assignor's obligations under Georgia law?

In 1983, the Georgia Court of Appeals said that "[i]t is a well established rule that a party to a contract cannot relieve himself of the obligations which the contract imposed upon him merely by assigning the contract to a third person." *Hall v. Robertson*, 309 S.E.2d 690, 691 (Ga. Ct. App. 1983) (quoting *Southern Concrete Co. v. Carter Constr. Co.*, 174 S.E.2d 447, 449 (Ga. Ct. App. 1970)). There, a real estate broker sued to recover commission due under a failed contract. *Id.* The trial court granted summary judgment in favor of the broker, and one defendant appealed, alleging that the trial court erred in its grant of summary judgment due to the defendant assigning its interest in the contract to a third party. *Id.* The court in *Hall* ultimately held that, absent evidence of an express or implied agreement between the parties "to a release and substitution," the trial court did not err in granting summary judgment for an ineffective novation. 309 S.E.2d at 691. In other words, a novation is required to discharge contractual obligations.

But, in 2016, the Georgia Court of Appeals stated that the assignee of property "acquires all of the rights and remedies possessed by the assignor *at the time of the assignment, and takes the <u>obligation, contract, chose, or other thing assigned</u> subject to the same restrictions, limitations, and defects as it had in the hands of the assignor.*" *Houghton v. Sacor Fin., Inc.*, 786 S.E.2d 903, 906 (Ga. Ct. App. 2016) (emphasis added) (quoting *Southern Telecom v. TW Telecom of Ga., LP*, 741 S.E.2d 234, 237–38 (Ga. Ct. App. 2013)). Put

differently, "an assignee stands in the shoes of the assignor and obtains no greater rights than the assignor possessed at the time of assignment." *Houghton*, 786 S.E.2d at 906 (quoting *Southern Telecom*, 741 S.E.2d at 237). In *Houghton*, Sacor Financial, Inc. sued Houghton for unpaid credit card charges. *Id.* at 904. On appeal, Houghton challenged the timeliness of the lawsuit, arguing that an assignment changed the statute of limitations. *Id.* The court in *Houghton*, held that the assignment came subject to the restrictions it had in the hands of the assignor, including the statute of limitations. 786 S.E.2d at 906–907.

The above cases show that the default rule in Georgia is that an assignee takes whatever the assignment contract assigns subject to the limitations and defects of the assigned thing in the hands of the assignor at the time of assignment and nothing more. It's up to the assignment contract. Contracts can allow "the other party to the contract . . . [to] agree to accept the responsibility of the assignee in place of the assignor . . . ." *Hall*, 309 S.E.2d at 691. If they do so, the contract is a novation. *Id.*

"[T]o constitute a novation, four essential requisites must exist: (1) a previous valid obligation, (2) the agreement of the parties to a new contract, (3) a mutual intention by the parties to substitute the new contract for the old one, and (4) the validity of the new contract." *Rounds v. Hall Cnty.*, 885 S.E.2d 256, 264 (Ga. Ct. App. 2023) (quoting *Atwood Servs., Inc. v. VFH Captive Ins. Co.*, 877 S.E.2d 699, 699 (Ga. Ct. App. 2022)). If any element is missing, there is no novation. *Id.* Furthermore, the issue of

the parties' mutual intent "for a . . . novation is ordinarily a question of fact reserved for a jury determination." *Rounds*, 885 S.E.2d at 264 (quoting *Feely v. First Am. Bank of Ga., N.A.*, 424 S.E.2d 345, 348 (Ga. Ct. App. 1992)). If "the intent of the parties is shown by clear, plain, and palpable evidence so that the jury can draw but one conclusion, the issue of intent can be decided as a matter of law and the summary judgment can be granted." *Rounds*, 885 S.E.2d at 264 (quoting *Feely*, 424 S.E.2d at 348).

Here, the relevant language regarding what was assigned in the Settlement and Assignment Agreement is:

> The Assignors hereby irrevocably assign, transfer, and set over to the Assignee all of the Assignors' rights, title, and interest in and to all claims, demands, rights, causes of action, or suits, whether legal or equitable, known or unknown, that the Assignors have or may have against Robertson-Ceco II Corporation d/b/a Ceco Building Systems ("CECO"), or any other party not released in the settlement agreement, arising out of or in connection with the solicitation, bidding, design, engineering, manufacturing, supply, or performance of work or materials for the **Advanced Battle Management System Maintenance and Logistics Facility project at Robins Air Force Base, Georgia,** initiated by the United States Army Corps of Engineers under Solicitation W912HN22B3005 (the "Project"). This includes all events and circumstances that form the basis of the claims asserted in *ACC Construction Co., Inc. v. Jerry Herron d/b/a HHH Building Sales, H3Co Systems, LLC, et al.,* Case No. 5:23-cv-00356-TES, pending in the United States District Court for the Middle District of Georgia.

[Doc. 72-11, pp. 1–2].

Neither party disputes that the Settlement and Assignment Agreement is a valid contract. The Agreement, by its terms, assigns ACC the "rights, title, and interest in and to all claims, demands, rights, causes of action, or suits . . . ." belonging to HHH. [*Id.* at

p. 1]. Therefore, ACC took HHH's rights, title, and interest in all claims, causes of action, or suits relating to "all events and circumstances that form the basis of the claims" in this lawsuit, and "subject to the same restrictions, limitations, and defects" as in HHH's hands at the time of assignment. [Doc. 72-11, p. 1]; *Houghton*, 786 S.E.2d at 906. Nothing in the Agreement purports to assign HHH's obligations related to this lawsuit to ACC. Nor does anything in the Agreement indicate intent for the assignment to be a novation. Therefore, HHH retained its obligations, ACC is not bound by HHH's obligations related to this lawsuit, and CECO's breach of contract counterclaim against ACC must fail. ACC cannot be held liable for breach of a contract under which it has no obligations.

CECO, nevertheless, claims that the Builder Agreement is the controlling contract for its indemnity claim. [Doc. 79, p. 14]. CECO argues that "ACC's claims against CECO on the assigned claim can be no more or less than the remedies available to HHH, should he have chosen to sue CECO for breach of contract." [*Id.* at p. 14]. Once again, ACC acquired HHH's rights to bring claims in this action subject to the limitations of those claims in HHH's hands at the time of assignment. *Houghton*, 786 S.E.2d at 906. But, this does not include HHH's obligations at the time of assignment since the obligations were not included in the agreement and the agreement was not a novation. ACC is not subject to the obligation of the indemnification provision of the agreement between HHH and CECO, so CECO's indemnity claim also must fail.

Therefore, the Court **GRANTS** ACC's Motion for Summary Judgment as to Counts 1 and 2 of CECO's counterclaims.[18] As such, there is no need for the Court to determine whether these claims are more appropriate as defenses or affirmative claims.

That leaves Count 3, CECO's contribution claim. [Doc. 58, p. 19]. In it, CECO seeks contribution under O.C.G.A. § 51-12-32. [*Id.* at p. 19]. In its Response, ACC makes several arguments against CECO's contribution claim. First, ACC argues that contribution under Georgia law relates only to joint tortfeasors, and there is nothing in the record making ACC and CECO joint tortfeasors. [Doc. 72, p. 16]. Second, ACC argues that contribution is third-party practice that is not affected by any settlement between a plaintiff and another joint tortfeasor. [*Id.* at p. 16]; *see also* O.C.G.A. § 51-12-32(a) ("[t]he right of a joint trespasser to contribution from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim."). CECO, in response, states that ACC has stepped into the shoes of HHH, and is now potentially responsible for contribution as a joint tortfeasor like HHH would be. [Doc. 79, p. 10]. Accordingly, CECO states that its "contribution claim against ACC, as an assignee of HHH, functions identically as a third party claim would." [*Id.* at p. 12].

However, CECO's argument fails here. To start, the parties dispute whether

---

[18] In the midst of its indemnity arguments, CECO also states that "any judgment on the assigned claims ACC acquires against CECO, must be setoff pursuant to the Builder Agreement." [Doc. 79, p. 14]. To be clear, the Court's ruling today in no way affects any limitations on ACC's recovery. As the Court has stated repeatedly in this Order, ACC accepted HHH's right to sue CECO subject to HHH's limitations at the time of assignment. *Houghton*, 786 S.E.2d at 906.

CECO and HHH acted jointly. *See, e.g.*, [Doc. 72-1, ¶¶ 18–19]; [Doc. 79-1, pp. 17–18]. But, more importantly, CECO's arguments fail for the same reasons as its first two counterclaims. CECO simply cannot bring a lawsuit for contribution against ACC when ACC was not the joint tortfeasor and, once again, did not assume anything more than the right to bring a lawsuit on behalf of HHH in the Agreement. ACC did not become the joint tortfeasor through the assignment, but instead CECO retained the right to bring a contribution claim against HHH as a third-party defendant after HHH was released under the Agreement. *See Jackson v. Dyches*, 407 S.E.2d 126, 127 (Ga. Ct. App. 1991); *see also Thompson v. Abbott*, 174 S.E.2d 904, 906 (1970), *overruled on other grounds by Ogden Equip. Co. v. Talmadge Farms, Inc.*, 208 S.E.2d 459 (1974) (wherein the plaintiff dismissed its action against one defendant, and the other defendant was able to bring third party claims against the released defendant). Therefore, the Court **GRANTS** ACC's Motion as to Count 3.

Bottom line, since CECO didn't bring its crossclaims against HHH before HHH was dismissed from this lawsuit, CECO should have brought third-party claims against HHH after ACC dropped its claims against HHH. *Jackson*, 407 S.E.2d at 127 ("The release in no way precludes defendant . . . from bringing a claim against his alleged joint tortfeasor [released defendant]."). CECO decided to bring these claims not against HHH as crossclaims when HHH was still a defendant or as third-party claims as a third-party defendant, but instead against ACC as counterclaims, which it cannot do.

The Court **GRANTS** ACC's Motion for Summary Judgment. [Doc. 72].

<u>CONCLUSION</u>

Accordingly, the Court **DENIES in part** ACC's *Daubert* Motion [Doc. 74],

**GRANTS** CECO's Motion to Strike [Doc. 83], **GRANTS in part** CECO's Motion for

Summary Judgment [Doc. 66], and **GRANTS** ACC's Motion for Summary Judgment

[Doc. 72]. The Court finds that there is a sufficient issue of fact in both ACC's breach of

contract claim and its claim for attorney's fees to continue to trial. In the Court's mind,

the issue for trial boils down to this: who bore the responsibility for finding and/or

disclosing the issue with the hangar door calculations? It's just that simple in the

Court's eye. Therefore, this case will continue to trial on Counts 1 and 5 of ACC's

Second Amended Complaint. The Court will issue an order shortly setting the relevant

dates for trial.

**SO ORDERED**, this 19th day of February, 2026.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**